**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-10323

_____

DEBORAH LAUBSCHER,
ROBERT LAUBSCHER,
   as surviving parents of Dani Laubscher,

                                                    *Plaintiffs-Appellants,*

*versus*

GWINNETT COUNTY,

                                                    *Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:24-cv-01891-LMM

_____

Before BRANCH, GRANT, and HULL, Circuit Judges.

HULL, Circuit Judge:

On April 30, 2022, Deborah Laubscher called 911 because she feared her 28-year-old child Dani, who was diagnosed with

schizoaffective disorder, was at risk of engaging in self-harm. Deborah told the dispatcher that Dani "was experiencing a mental health crisis" and requested "a crisis intervention team" trained in responding to mental health emergencies. Gwinnett personnel (police and firefighter EMTs) "responded without any persons trained in mental health issues." When the responders arrived, Dani was acting erratically and was holding a knife that Dani refused to drop when repeatedly ordered to do so. After a struggle for the knife, the interaction ended with a police officer killing Dani.

Dani's parents ("the Laubschers") sued Gwinnett County ("Gwinnett") on Dani's behalf under Title II of the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act ("RA"), seeking damages. In their first amended complaint ("the complaint"), the Laubschers alleged that Gwinnett discriminated against Dani in violation of Title II and the RA by failing to accommodate Dani's disability (1) by sending police officers, not a mental health professional, to respond to mental health calls and (2) by failing to train police officers in crisis intervention techniques.

The Laubschers asserted that Gwinnett failed to reasonably accommodate Dani because of (1) the specific actions of the responders at the scene of the shooting and (2) Gwinnett's policies existing on April 30, 2022, regarding its emergency response services. As part of their policy claims, the Laubschers contended that Gwinnett could have reasonably accommodated Dani's

mental health disability by, among other things, training its police officers in emergency mental health response or staffing police response teams with clinicians trained in mental health emergencies.

The district court dismissed the Laubschers' complaint. The Laubschers appeal that ruling, but only the part dismissing their claims as to Gwinnett's policies, not as to the specific actions of the responders at the scene.

After careful review, and with the benefit of oral argument, we affirm the district court's dismissal of the Laubschers' complaint. Because the Laubschers seek compensatory damages against Gwinnett, a public entity, under Title II and the RA, the Laubschers must show that Gwinnett engaged in intentional discrimination against Dani, which requires the Laubschers to show deliberate indifference. The Laubschers' complaint does not allege any prior incidents similar to the April 30, 2022 incident involving police and EMT response to mental health emergencies that resulted in ADA violations. The Laubschers have not plausibly alleged that Gwinnett's policymakers were deliberately indifferent to any alleged disability discrimination.

## I. FACTUAL BACKGROUND

In April 2024, the Laubschers filed an initial complaint against Gwinnett. The Laubschers asserted claims under (1) Title II of the ADA, 42 U.S.C. § 12132, and (2) section 504 of the RA, 29 U.S.C. § 794(a). The Laubschers sought only monetary damages.

In July 2024, as of right the Laubschers filed a first amended complaint, which is the operative complaint now. The complaint reasserted the same legal claims but contained additional factual allegations.

We recount the complaint's allegations and events shown in the videos submitted in this case.[1] In doing so, we accept all allegations as true and draw all reasonable inferences in the Laubschers' favor, except where obviously inconsistent with the submitted video evidence. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300–01 (11th Cir. 2024).

## A.    Dani's Mental Disability and Prior 911 Calls

On April 30, 2022, Dani was twenty-eight years old, suffered from schizoaffective disorder, and lived with the Laubschers in Gwinnett. Dani's symptoms included depression, paranoia, and suicidal thoughts. Dani was receiving treatment, including therapy and medication.

Prior to April 30, 2022, Deborah had called 911 at least three times requesting a crisis intervention team trained in mental health emergency response to help Dani. On each of those occasions, a crisis intervention team was dispatched, and each occasion was resolved without incident. Each time, the trained responders spoke

---

[1] With its motion to dismiss, Gwinnett submitted two officer bodycam videos depicting the April 30, 2022 shooting. The district court concluded that it could consider the bodycam videos in analyzing Gwinnett's motion to dismiss. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The Laubschers do not challenge that ruling on appeal.

with Dani and left after concluding that Dani did not qualify for involuntary commitment.  The complaint did not allege who specifically was on the crisis intervention team that responded on the prior occasions.

### B.    The 911 Call

On April 30, 2022, Deborah noticed that Dani was acting erratically.  Deborah was worried that Dani had not taken the medications prescribed for Dani's mental illness and had taken other drugs.[2]  Concerned that Dani might engage in self-harm, Deborah called 911 and asked for a crisis intervention team. Deborah explained that Dani was experiencing a mental health crisis and had not hurt anyone.[3]

### C.    Officer Miller and Two EMTs Respond

The dispatcher told responding personnel that the situation was a "psych suicide" call and did not inform them of Dani's prior 911 calls.  Gwinnett County Police Department Officer Robert Miller and two firefighters with EMT training (the "EMTs") were the first to arrive at the Laubschers' home.  According to the complaint, none of the responders had received specialized mental health emergency response training.  Deborah came to the door

---

[2] Deborah told the responding officers and EMTs when they arrived on the scene that she believed Dani had taken acid.  However, according to the complaint, toxicology reports revealed that the only drugs in Dani's system at the time of Dani's death were those prescribed for Dani's mental illness.

[3] The complaint does not say whether Deborah told the 911 operator that Dani had a knife or posed a danger to any other person.

and told the responders that Dani had taken acid, was "psychotic," was not attacking her at that time, and had a switchblade. The EMTs entered the home first, followed by Officer Miller.

Dani was standing holding a knife at the top of a staircase that was situated immediately behind the front door. The EMTs went halfway up the staircase. The EMTs then "began to administer emergency mental health care" to Dani by calmly asking Dani to put the knife down. When Dani did not immediately comply, Officer Miller instructed the EMTs to come down the stairs. Dani then made a quick movement to go down the stairs, but Officer Miller yelled at Dani to stop. During multiple points, Dani moved erratically up and down the stairs, in response to which Officer Miller told Dani to stop and put the knife down in a louder voice.

## D.    Officer Mendez and a Third Officer Arrive

At some point during the incident, Gwinnett County Police Department Officer Kevin Mendez and a third officer arrived on the scene. Officer Mendez entered the home and joined Officer Miller in instructing Dani in a loud voice to put the knife down.

Dani did not comply with the officers' commands and remained standing on the staircase, moving up and down the stairs unpredictably. Eventually, Officer Mendez warned Dani of tasing if Dani did not put the knife down. Officer Miller did not want to tase Dani out of fear that Dani would fall down the stairs. As Dani made another sudden movement to come down the stairs, the

officers began yelling at Dani to put the knife down and shined a flashlight at Dani.

### E.    Tasing

When Dani neared the bottom of the staircase, one of the officers tased Dani, but Dani remained standing.  The officer then tased Dani again, causing Dani to fall back onto the stairs, although Dani did not drop the knife.  While this was happening, Officer Mendez pointed his firearm at Dani, and the officers told Dani to put the knife down and get on the ground.

Dani then tried to stand up again but was unable to and fell down the stairs onto the ground while still holding the knife.

Now at the bottom of the stairs, Dani started to rise, and Officer Miller and one of the EMTs struggled with Dani in an attempt to retrieve the knife from Dani.  The struggle resulted in the EMT on top of Dani forcing Dani back onto the ground. Officer Mendez ordered the EMT to get off of Dani, and the EMT complied.

Once the EMT moved away, Dani started standing again, and Officer Mendez approached Dani with his firearm raised, yelling, "I'm gonna fucking shoot you."  Officer Mendez then moved away and ordered one of the other officers to tase Dani again.  Dani stepped backwards and forwards in a confused manner, and Officer Mendez yelled, "Don't you fucking step towards me. Don't you fucking do it."

At Officer Mendez's command, Officer Miller tased Dani again, and Dani fell face forwards onto the ground but still did not let go of the knife.

## F.    Shooting and Aftermath

Officer Mendez then moved towards Dani and stood over Dani.  With his gun aimed at Dani, Officer Mendez yelled, "Grab the knife."  Officer Mendez then leaned over Dani and with his left hand moved to grab Dani's arm while still holding his firearm in his right hand.

Immediately, Dani flipped over face up and moved the hand holding the knife rapidly towards Officer Mendez.[4]  Officer Mendez simultaneously stepped backwards and fired a single shot into Dani's chest.

Dani then lay still on the ground and dropped the knife. After one of the EMTs kicked the knife out of Dani's reach, Dani was provided with medical attention.  Dani ultimately died from the bullet wound.

## II.  FAILURE-TO-ACCOMMODATE CLAIMS

The complaint alleged that Gwinnett discriminated against Dani in violation of Title II of the ADA and section 504 of the RA by failing to accommodate Dani's mental health disability in its emergency response services, which resulted in Dani's death.  The

---

[4] The district court found that the video clearly showed that Dani slashed the knife at Officer Mendez.  The Laubschers contest that finding on appeal, but the resolution of this factual issue is irrelevant for deciding this case.

complaint contained allegations that can be divided into two distinct categories: (1) Gwinnett's policies, prior to the shooting, as to crisis intervention training for police sent to mental health emergencies and (2) the responding officers' specific actions at the scene on April 30, 2022.

As noted above, the Laubschers do not appeal the dismissal of their claims for Gwinnett's officers' individual failure to accommodate Dani's disability at the scene. Rather, the Laubschers appeal the dismissal of their claims that Gwinnett's numerous policy defects as to mental health disabilities caused Dani's death.

## A.    Policy Claims

In that regard, the complaint alleged that Gwinnett's policies failed to accommodate Dani's mental health disability because (1) Gwinnett failed to train its police officers in mental health emergency response despite sending police officers to respond to mental health emergencies; (2) Gwinnett had a policy of dispatching untrained police officers in response to mental health emergency calls; (3) although it received "hundreds of [suicide] calls per month," Gwinnett did not adequately staff trained mental health units to be sent for mental health emergency calls; (4) despite having an unspecified contract[5] to provide increased medical responses to mental health crises, Gwinnett failed to hire

---

[5] The complaint alleged this unspecified contract provided for the hiring of seven full-time mental health clinicians, but not one full-time clinician was hired for more than a year after Gwinnett entered into the contract.

trained clinicians and to have 911 operators identify individuals, like Dani, who frequently called for assistance and would benefit from behavioral health services and support; and (5) Gwinnett's policies exacerbated Dani's mental health crisis.

The complaint alleged that, as of April 30, 2022: (1) Gwinnett had only one part-time mental health response unit for the entire county, which was staffed by only one police officer and one licensed mental health clinician; (2) that clinician worked only for an average of approximately twelve hours per week; (3) the part-time unit had long response times or could not respond to emergency calls at all; and (4) a co-responding police officer trained in mental health emergency response was dispatched for mental health emergencies only if responding officers requested support.

## B.    Deliberate Indifference in not Modifying Policies

The complaint also alleged that Gwinnett acted with deliberate indifference in failing to modify its policies to accommodate Dani's disability.  The complaint asserted that various Gwinnett officials[6] (1) knew that Gwinnett's emergency response policies made it substantially likely that disabled individuals would be denied their rights under the ADA and RA; (2) knew that its police officers were "de facto mental health

---

[6] Those officials listed were (1) Officer Mendez, (2) the Gwinnett County Police Department Chief of Police, (3) other "[Gwinnett County Police Department] leadership," and (4) the Gwinnett County Board of Commissioners.

responders" but failed to train those officers in mental health emergency response or to adequately staff and support mental health crisis intervention teams; and (3) disregarded the risk of sending police officers to respond to mental health emergencies despite knowing that this "would lead to dangerous situations for Gwinnett's mentally disabled residents."

The complaint also alleged that Gwinnett officials knew of U.S. Department of Justice reports from 2023 and 2024 that concluded that relying on police officers as primary responders for mental health emergencies violated the ADA.

The complaint, however, did not allege any prior incidents in Gwinnett similar to the April 30, 2022 incident that resulted in ADA violations.

### III.  GWINNETT'S MOTION TO DISMISS

Gwinnett moved to dismiss the Laubschers' complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Gwinnett argued that (1) Title II of the ADA did not apply to police officers performing police-type activities; (2) the Laubschers did not adequately allege that Gwinnett was deliberately indifferent to Dani and did not point to prior incidents similar to the April 30, 2022 shooting; and (3) none of the Laubschers' proposed policy accommodations were reasonable.

On October 25, 2024, the district court granted Gwinnett's motion to dismiss.  The district court first rejected Gwinnett's

argument that Title II of the ADA did not apply to police encounters.[7]

Nevertheless, the district court determined that none of the Laubschers' proposed accommodations were reasonable. The district court noted that the Laubschers' complaint acknowledged that, in response to Deborah's call, Gwinnett provided a "significant portion" of the relief they wanted by dispatching EMT firefighters with medical training who administered emergency mental health care to Dani.

The district court then concluded that under *Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007), the Laubschers' proposed accommodations relating to the responding police officers' actions on April 30, 2022, were unreasonable because the proposed accommodations would interfere with police decision-making in exigent circumstances. The district court did not address Gwinnett's arguments relating to deliberate indifference.

The Laubschers timely appealed.

## IV.  STANDARD OF REVIEW

We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6), "accept[ing] all factual allegations in the complaint as true and constru[ing] them in the light most favorable to the non-movant." *Jastram v. NextEra Energy, Inc.*, 161 F.4th 693,

---

[7] Gwinnett does not challenge this ruling on appeal.

706 (11th Cir. 2025). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## V.  DISCUSSION

### A.    ADA's Title II and RA's § 504

Title II of the ADA states that, subject to certain provisions, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. And section 504 of the RA states, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). These provisions are governed by the same legal standard. *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1301 n.2 (11th Cir. 2022). So our analysis applies to both Title II and the RA.

The text of Title II does not explicitly impose a duty on public entities to provide reasonable accommodations to qualifying individuals with a disability as to the public entities' services. *See Bircoll*, 480 F.3d at 1082 n.13. Title II, however, required the Attorney General to make regulations to implement

the act. 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations . . . that implement [Title II].").

In turn, the implementing regulations for Title II state, "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[8] 28 C.F.R. § 35.130(b)(7)(i).

Accordingly, courts have read Title II to impose a duty on public entities to provide "reasonable" accommodations to qualifying individuals with a disability as to their services. *See Tennessee v. Lane*, 541 U.S. 509, 531–33 (2004) (describing the "duty to accommodate" individuals with a disability that Title II created for public entities); *Bircoll*, 480 F.3d at 1081–83 & n.13, 1085–88 (assuming the Title II implementing regulations that impose a duty to accommodate are valid and reviewing whether police satisfied that duty as to deaf individual during and after arrest); *see also Alexander v. Choate*, 469 U.S. 287, 299–301 & n.21 (1985) (explaining that under certain circumstances the RA requires

---

[8] This Court and the Supreme Court have not decided the validity of the implementing regulations. *See Bircoll*, 480 F.3d at 1082 n.13. The parties do not dispute the validity of the regulations, and we need not consider their validity to resolve this appeal.

a federal grantee to make "reasonable accommodations" in its programs or benefits).

## B.     Elements of Compensatory-Damages Claim

To state a claim under Title II or the RA, a plaintiff generally must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll*, 480 F.3d at 1083; *Silberman v. Mia. Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019).

Even if the Laubschers adequately stated a Title II failure-to-accommodate claim, they sought compensatory damages and therefore also needed to allege that Gwinnett intentionally discriminated against Dani.[9]  *See Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022).

On appeal, the parties assume that Dani was a qualified individual with a disability.[10]  Their dispute is mainly over

---

[9] The Laubschers also sought punitive damages, but neither Title II nor the RA permit plaintiffs to recover punitive damages. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  To the extent that the Laubschers additionally sought injunctive relief, they lack standing to do so because their claims are based solely on past harm, not on any "continuing, present adverse effects" of Gwinnett's actions. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

[10] Given that Dani had a knife and would not drop it, there is a serious question whether Gwinnett was required to provide Title II accommodations to Dani

(1) whether the Laubschers' proposed policy accommodations were "reasonable" and (2) whether Gwinnett intentionally discriminated against Dani.

To establish that a public entity, like Gwinnett, engaged in intentional discrimination for purposes of the ADA and the RA, a plaintiff must allege that a qualifying official of the public entity who possessed "substantial supervisory authority" was deliberately indifferent to the plaintiff's statutory rights. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 349–50 (11th Cir. 2012); *see also Ingram*, 30 F.4th at 1257. As explained below, the Laubschers have not plausibly alleged deliberate indifference, which obviates the need to decide anything else.[11]

## C.    Intentional Discrimination—Deliberate Indifference

Deliberate indifference is an "exacting standard." *Liese*, 701 F.3d at 344 (quoting *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1259 (11th Cir. 2010)). In order to establish that a government entity was deliberately indifferent, "the plaintiff must demonstrate

---

at all. Under 28 C.F.R. § 35.139, a public entity does not need to "permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a). Because the parties do not raise this threshold issue, we need not address it.

[11] For the first time on appeal, Gwinnett also argues that at the time of the shooting, the Laubschers did not adequately request the accommodations to Gwinnett's policies that they seek now. We address this issue below. In light of our deliberate-indifference ruling, it is unnecessary to discuss whether the Laubschers' requested accommodations were reasonable.

that an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf had <u>actual knowledge</u> of discrimination in the entity's programs and failed adequately to respond." *Silberman*, 927 F.3d at 1134 (citation modified) (emphasis added) (quotations omitted). To satisfy this standard, the plaintiff must show "more than gross negligence." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014).

At this juncture, the parties do not dispute that the Laubschers' complaint identified Gwinnett personnel who qualify as appropriate officials, to wit: the Chief of Police, other "[Gwinnett County Police Department] leadership," and the Gwinnett County Board of Commissioners. The issue becomes only whether the Laubschers sufficiently alleged that any of those officials "had actual knowledge of discrimination in [Gwinnett's] programs and failed adequately to respond." *See Silberman*, 927 F.3d at 1134 (citation modified) (quotations omitted).

The usual way to establish deliberate indifference is by proving discrete actions that an official took <u>directed specifically at the plaintiff</u>. *See, e.g.*, *Liese*, 701 F.3d at 351–52 (concluding that the record could support finding that hospital was deliberately indifferent to needs of deaf plaintiff where plaintiff submitted evidence that her doctor asked if she could read lips, laughed at her, and ignored multiple requests for an interpreter).

This case is different from the usual case, however, because the Laubschers' claims are mainly based on Gwinnett's alleged

policies of not training its police responders for mental health emergencies prior to April 30, 2022, not actions specifically directed at Dani.[12]  Unlike in *Liese*, there is no indication that the Gwinnett officials (identified by the Laubschers) knew anything about Dani or Dani's need for an accommodation in the county's emergency response services prior to April 30.

As a result, Gwinnett argues that to show actual knowledge of disability discrimination in its policies, the Laubschers' complaint needed to identify and allege prior incidents with disabled persons similar to the April 30, 2022 shooting.  As support, Gwinnett emphasizes that failure-to-train cases under 42 U.S.C. § 1983 ordinarily require a plaintiff to show a pattern of similar constitutional violations by the municipality's untrained employees to establish deliberate indifference.  *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).  The reason for that is, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have

---

[12] This Court has not addressed whether a plaintiff may bring failure-to-train-police claims under the ADA.  It is an open question whether (1) Title II of the ADA requires a police department to draft policies and train police officers on the needs of the mentally ill public or (2) plaintiffs could even seek compensatory damages based on such a requirement.  But if such claims are available under Title II of the ADA, at a minimum the deliberate-indifference standard would apply to claims for compensatory damages.

deliberately chosen a training program that will cause violations of constitutional rights."[13] *Id.*

We agree with Gwinnett that the same § 1983 rule applies here. To show actual knowledge and hold a public entity liable for compensatory damages under the ADA and RA, plaintiffs asserting claims like the Laubschers' based on a public entity's upstream policies must show a pattern of incidents and ADA violations similar to the underlying alleged discrimination. *See Connick*, 563 U.S. at 62–64. Other circuit courts have imposed the same § 1983 requirement for similar ADA claims. *See, e.g.*, *Haberle v. Troxell*, 885 F.3d 170, 181–83 (3d Cir. 2018); *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1298 (10th Cir. 2016).

## D.    Analysis

Applying these principles, we agree with Gwinnett that the Laubschers' complaint failed to sufficiently allege deliberate

---

[13] *Connick* recognized an exception to this rule in the "rare" situation where "the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. The Laubschers' complaint did not allege that the risk of discrimination was obvious, and its allegations do not create a reasonable inference of patent obviousness. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1329 (11th Cir. 2015) (holding in § 1983 failure-to-train case that plaintiffs failed to allege that the need for police officers to have "specialized training in the constitutional restrictions on the use of force when dealing with mentally ill citizens" was sufficiently obvious to establish deliberate indifference).

indifference.[14]  The Laubschers did not allege any prior incidents similar to the April 30, 2022 shooting.

The closest the Laubschers came to satisfying that requirement is their allegation that Gwinnett received hundreds of emergency calls relating to suicide per month.  The complaint, however, did not express if any of those calls (1) involved persons with disabilities similar to Dani or (2) resulted in a police shooting or even negative outcomes for individuals with a disability like Dani.  There is no indication in the complaint that on any occasion prior to April 30, 2022, individuals with a disability like Dani were denied the benefits of Gwinnett's emergency response services. Without such allegations, we cannot reasonably infer from the face of the complaint that prior incidents similar to the April 30, 2022 shooting occurred in Gwinnett such that Gwinnett officials had actual knowledge that the county's policies resulted in disability discrimination.

As the Third Circuit has expressed, the fact that a public entity's emergency response policies might have fallen below national standards does not on its own establish deliberate

---

[14] Although the district court did not address the deliberate-indifference issue, the parties briefed it before the district court and on appeal, and "[w]e may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Affordable Aerial Photography, Inc. v. Prop. Matters USA, LLC*, 108 F.4th 1358, 1366 (11th Cir. 2024) (alteration in original) (quoting *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017)).

indifference without a preexisting pattern of violations. *See Haberle*, 885 F.3d at 182.

### E.    The Laubschers' Argument

The Laubschers also argue that they did not need to allege prior similar incidents by attempting to reframe the nature of Gwinnett's alleged Title II violation. The Laubschers contend that (1) Gwinnett's Title II violation was its failure to modify its emergency response policies (*i.e.*, dispatching armed police lacking mental health training) in order to accommodate people with a disability prior to April 30, 2022, and (2) the April 30, 2022 shooting was merely a "downstream consequence" of that violation. The Laubschers assert that the April 30, 2022 shooting was merely the harm that resulted from Gwinnett's prior Title II violation rather than the violation itself. In fact, the Laubschers propose that even if the April 30, 2022 shooting had not happened, Gwinnett's actions would nevertheless constitute intentional discrimination against Dani.

We readily reject the Laubschers' argument for two main reasons. First, under the statutory text, a Title II violation occurs when a qualifying individual with a disability is "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity" or is otherwise "subjected to discrimination by any such entity." 42 U.S.C. § 12132. In this case, the alleged Title II violation could only have occurred once Dani was "denied the benefits of" Gwinnett's emergency response services on April 30, 2022, not when Gwinnett made an earlier

policy decision. That is so even if Gwinnett's policy decision could later result in Dani being denied the benefits of those emergency response services. In other words, if the April 30, 2022 shooting had not occurred (or a similar negative outcome), then there could not possibly have been any claim of disability discrimination as to Dani.

Second, a public entity's duty to accommodate a person with a disability with respect to its services is only triggered once the person with a disability makes clear to the public entity his need for an accommodation to enjoy the benefits of the public entity's services. *See Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (explaining in a Title I ADA case that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made"); *Charles v. Johnson*, 18 F.4th 686, 703 (11th Cir. 2021) (same in RA case). Because Gwinnett's policy officials did not know anything about Dani or Dani's needs when they implemented the county policies that the Laubschers now claim to be discriminatory, Gwinnett did not have any duty to Dani under Title II at that time. Since that is the case, Gwinnett's alleged policy decisions that were made prior to the April 30, 2022 shooting, and without any knowledge of Dani or Dani's needs, could not in themselves have constituted intentional discrimination against Dani under Title II.

## VI.  CONCLUSION

We affirm the district court's dismissal of the Laubschers' complaint because it failed to plausibly allege that Gwinnett intentionally discriminated against Dani.

**AFFIRMED.**